MARTIN E. LEVIN (Bar No. 296150)
NORA J. CHOROVER (Bar No. 547352)
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, 5th Fl.
Boston, MA  02114
Phone: 617-742-5800
Fax:     617-742-5858

Attorneys for Plaintiff
CLEAN WATER ACTION

Filed Electronically 6/2/11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CLEAN WATER ACTION,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>BERKSHIRE CONCRETE CORP.,<br><br>　　　　　　Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CLEAN WATER ACTION ("CWA") by and through its counsel, hereby alleges:

**INTRODUCTION**

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq. (the "Clean Water Act" or "the Act"). Plaintiff seeks declaratory judgment, injunctive relief, and other relief the Court deems appropriate with regard to actions taken by Berkshire Concrete Corp. ("Defendant") which resulted in the discharge of storm water runoff from the Berkshire Concrete facility on Cheshire Road in Pittsfield, Massachusetts, into waters of the United States, in violation of the Act.

2. Activities that take place at industrial facilities, such as material handling and storage, are often exposed to the weather. As runoff from rain or snow melt comes into contact with these materials, it picks up pollutants and transports them to nearby storm sewer systems, rivers, lakes, or coastal waters. Storm water pollution is a significant source of water quality problems for the nation's waters. The Massachusetts Department of Environmental Protection has determined that storm water runoff represents the single largest source responsible for water quality impairments in the Commonwealth's rivers, lakes, ponds, and marine waters.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

4. On December 6, 2010, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("DEP"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

5. On December 28, 2010, Plaintiff supplemented its Notice Letter, to provide to Defendant, EPA, and DEP, clarification that the violations set forth in the Notice Letter pertained to Defendant's violations of the Multi-Sector General Permit issued by EPA pursuant to the Act. True and correct copies of the Notice Letter and supplement thereto are attached as Exhibit A, and are incorporated by reference.

6. More than sixty days have passed since notice was served on Defendant and the state and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the Commonwealth of Massachusetts has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

7.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

8.     Plaintiff CLEAN WATER ACTION ("CWA") is a nationwide non-profit public benefit corporation organized under the laws of the District of Columbia, with its principal office located in Boston, Massachusetts.  CWA has approximately 50,000 members who live, recreate and work in and around waters of the Commonwealth of Massachusetts, including Unkamet Brook and the Cheshire Reservoir.  CWA is dedicated to working for clean, safe and affordable water, protection of natural resources, the prevention of health-threatening pollution, the creation of environmentally safe jobs and businesses, and the empowerment of people to make democracy work.  To further these goals, CWA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9.     Members of CWA have a recreational, aesthetic and/or environmental interest in Unkamet Brook and the Cheshire Reservoir.  One or more of such members who reside in the Pittsfield area use and enjoy Unkamet Brook and the Cheshire Reservoir for recreation, sightseeing, wildlife observation and/or other activities in the vicinity of and downstream of Defendant's discharges. These members use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.   The interests of CWA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act, as alleged herein.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

10.    Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and the citizens of the Commonwealth of Massachusetts, for which harm they have no plain, speedy, or adequate remedy at law.

11.    Defendant BERKSHIRE CONCRETE CORP. is a corporation organized under the laws of the Commonwealth of Massachusetts that operates a concrete manufacturing facility in Pittsfield.

## STATUTORY BACKGROUND

12. <u>Pollutant Discharges without a Permit are Illegal</u>.  The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by the federal Environmental Protection Agency ("EPA") under the National Pollutant Discharge Elimination System ("NPDES").  Sections 301(a), 402(a) and 402(p) of the Act. 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

13. <u>EPA Has Made Stormwater Discharges from Concrete Products Manufacturers Subject to the Requirements of EPA's General Industrial Stormwater Permit</u>.  In order to minimize polluted storm water discharges from industrial facilities, the federal Environmental Protection Agency has issued a general industrial storm water permit ("Stormwater Permit").  EPA's Stormwater Permit was first issued in 1995, and was reissued in 2000 and 2008.  <u>See</u> 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008).  Concrete products manufacturers are subject to the requirements of this Stormwater Permit.  Stormwater Permit, Appendix D, pg. D-3.

14. <u>Concrete Products Manufacturers Must Comply with the Monitoring and Reporting Requirements of the Stormwater Permit</u>.  The Stormwater Permit requires these facilities to, among other things:

   a. ensure that storm water discharges do not cause or have the reasonable potential to cause or contribute to a violation of water quality standards, Stormwater Permit, pg. 16;

   b. conduct monitoring of storm water discharges at all Facility outfalls in each of the first four full quarters of permit coverage for compliance with benchmark limitations applicable specifically to concrete products manufacturers, Stormwater Permit, pgs. 36, 56-57;

   c. report all monitoring results for all Facility outfalls to EPA by specified deadlines, Stormwater Permit pg. 41;

      d.      conduct corrective action after the average of 4 quarterly samples exceed the EPA benchmark value, Stormwater Permit, pg. 18, 36;

      e.      conduct routine facility inspections at least quarterly, quarterly visual assessments, and annual comprehensive inspections to, among other things, sample and assess the water quality of the facility's storm water discharges, ensure that storm water control measures required by the Permit are functioning correctly and adequately, and timely perform corrective actions when they are not, Stormwater Permit, pg. 18-25;

      f.      timely prepare and submit to EPA annual reports that include findings from the annual comprehensive site inspections and documentation of corrective actions, Stormwater Permit, pg. 24, 41; and

      g.      comply with any additional state requirements, *see* Stormwater Permit, pg. 140-141.

15.    <u>Citizens may bring an action to enforce these requirements</u>.  Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

### STATEMENT OF FACTS

16.    Defendant owns and/or operates a facility at 550 Cheshire Road, Pittsfield, Massachusetts (the "Facility").  Operations at the Facility include concrete products manufacturing (standard industrial classification 3273).  The Facility covers over 100 acres and is located in close proximity to wetlands, with Unkamet Brook approximately a third of a mile to the south and west, and Cheshire Reservoir and the Hoosic River approximately a third of a mile to the north and east.

17.     Cheshire Reservoir is a tributary of the Hoosic River. Unkamet Brook is a tributary of the Housatonic River. Cheshire Reservoir and Unkamet Brook are waters of the United States, as are the Hoosic and Housatonic Rivers.

18.     On April 17, 2009, Defendant certified to EPA that it operated a concrete block and brick facility at 550 Cheshire Road (Route 8) in Pittsfield, and that storm water from the Facility is discharged to Cheshire Reservoir and Unkamet Brook. Storm water runoff from the Facility is discharged into municipal storm drains and other tributaries leading to Cheshire Reservoir and Unkamet Brook.

19.     Numerous activities at the Facility take place outside and are exposed to rainfall. These include, without limitation, storage of concrete blocks and forms; spray washing of concrete forms; loading of forms onto trucks; and unloading of raw materials.

20.     Industrial machinery and heavy equipment, including trucks and fork lifts, are operated, maintained, or stored at the Facility in areas exposed to storm water flows. Plaintiff is informed and believes, and thereupon alleges, that the operation, maintenance, and/or storage of such machinery and equipment results in spilling and leaking of contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids, which contaminants are exposed to storm water flows.

21.     During every rain event, rainwater flowing over exposed concrete, dust, debris, sediment, waste materials and other accumulated pollutants at the Site becomes contaminated with pollutants.

22.     Plaintiff is informed and believes, and thereupon alleges, that rainwater and snow melt (collectively referred to hereinafter as "Stormwater") flowing over the Facility collects suspended solids, iron, dust (including but not limited to concrete dust), debris, oil, grease, and other pollutants.

23.     The polluted Stormwater from the Facility discharges to Cheshire Reservoir and Unkamet Brook. On information and belief, control measures taken at the Facility are inadequate to prevent such discharges from exceeding the Permit's benchmark standards for iron and/or suspended solids.

24. Suspended solids in high concentrations block sunlight from reaching vegetation submerged in waterbodies, and can cause many problems for water quality and aquatic life, including decreased dissolved oxygen, habitat alteration, and increased pathogens. These problems are exacerbated by the presence of oil and grease, which can float on the water's surface and block sunlight needed by underwater fish and plants. The combination of oil and grease and particulates can also damage stream habitat and sensitive spawning areas when they cling to sand and gravel particles that settle to the bottom of streambeds.

25. Dissolved iron is bioavailable and can be toxic to fish and other aquatic life. Iron in the form of solid particulate can settle on the bottom of waterbodies and destroy bottom-dwelling invertebrates, plants, or incubating fish eggs. Iron can also cause aesthetically objectionable conditions in waterbodies by making the water appear rust colored.

**FIRST CAUSE OF ACTION**
**Failure to Comply with the Monitoring Requirements of the Stormwater Permit:**
**Violations of 33 U.S.C. §§ 1311(a)**

26. Plaintiff re-alleges and incorporates Paragraphs 1-25, inclusive, as if fully set forth herein.

27. Defendant has failed to comply with the Stormwater Permit's requirement for monitoring of discharges to Cheshire Reservoir and Unkamet Brook. On information and belief, Defendant failed to conduct monitoring of the Stormwater discharges from the Facility for compliance with the benchmark limitations for iron and Total Suspended Solids ("TSS") in each of the first four full quarters beginning with the quarter following their Permit coverage in April, 2009. At least six quarters have now passed, and Defendant has failed to conduct the required benchmark monitoring in any four consecutive quarters. [Stormwater Permit, pg. 39, section 6.2.4.2.]

28. These violations, which are set forth on Exhibit B hereto, establish an ongoing and continuing pattern of failure to comply with the Permit's monitoring requirements.

29. Each of Defendant's violations of the monitoring requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the failure to monitor occurred and/or continued. Alternatively, each of these violations is a

separate and distinct violation for each day on which Stormwater was discharged from the facility and on which the violation occurred and/or continued.  To the extent it is determined that rain days are relevant in determining the dates of violations, such rain dates through March 2011 are set forth on Exhibit C, hereto.

## SECOND CAUSE OF ACTION
### Failure to Comply with the Reporting Requirements of the Stormwater Permit: Violations of 33 U.S.C. §§ 1311(a)

30.     Plaintiff re-alleges and incorporates Paragraphs 1-29, inclusive, as if fully set forth herein.

31.     Defendant has failed to comply with the Stormwater Permit's requirement for reporting benchmark monitoring results to EPA for discharges from its Facility.  Defendant has failed to report to EPA results of benchmark monitoring it has conducted, if any, within 30 days of receipt of monitoring results, as required by the Permit. [Stormwater Permit, pg. 55, concrete products manufacturers, Stormwater Permit, pgs. 56-57]  Defendant's violations of the Permit's reporting requirements are separate and distinct from violations of the Permit's monitoring requirements.

32.     These violations, which are set forth on Exhibit B, establish an ongoing and continuing pattern of failure to comply with the Permit's reporting requirements.

33.     Each of Defendant's violations of the benchmark monitoring reporting requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the failure to report occurred and/or continued.  Alternatively, each of these violations is a separate and distinct violation for each day on which Stormwater was discharged from the facility and on which the violation occurred and/or continued.  To the extent it is determined that rain days are relevant in determining the dates of violations, such rain dates through March 2011 are set forth on Exhibit C, hereto.

## THIRD CAUSE OF ACTION
### Failure to Timely Submit Annual Reports to EPA: Violations of 33 U.S.C. §§ 1311(a)

34.     Plaintiff re-alleges and incorporates Paragraphs 1-33, inclusive, as if fully set forth herein.

35.     Defendant has failed to comply with the Stormwater Permit's requirement to timely prepare and submit to EPA annual reports that include findings from annual comprehensive site inspections and documentation of corrective actions.  Defendant did not submit to EPA an annual report for the first year of the permit term by November 13, 2009, as required by the Permit.  Defendant did not submit to EPA an annual report for the second year of the permit term by November 13, 2010, as required by the Permit.  Stormwater Permit, [4.3.1, 4.3.2, 7.2].

36.     These violations, which are set forth on Exhibit B, establish an ongoing and continuing pattern of failure to comply with the Permit's reporting requirements.

37.     Each of Defendant's violations of the annual reporting requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued.  Alternatively, each of these violations is a separate and distinct violation for each day on which Stormwater was discharged from the facility and on which the failure to timely report occurred and/or continued.  To the extent it is determined that rain days are relevant in determining the dates of violations, such rain dates through March 2011 are set forth on Exhibit C, hereto.

**RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

1.     Declare Defendant to have violated and to be in violation of the Act as alleged herein;

2.     Enjoin Defendant from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility;

3.     Require Defendant to implement the requirements of the Stormwater Permit;

4.     Order Defendant to pay civil penalties of up to $37,500 per day of violation for its violations after January 12, 2009, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

5. Order Defendant to take appropriate actions to restore the quality of navigable waters impaired by their activities;

6. Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

7. Award any such other and further relief as this Court may deem appropriate.

Dated:   June 2, 2011                           Respectfully submitted,


                                                */s/Martin E. Levin*
                                                MARTIN E. LEVIN (Bar No. 296150)
                                                NORA J. CHOROVER (Bar No. 547352)
                                                Stern, Shapiro, Weissberg & Garin, LLP
                                                90 Canal Street, 5th Fl.
                                                Boston, MA  02114
                                                Phone: 617-742-5800
                                                Fax:    617-742-5858

                                                Attorneys for Plaintiff
                                                CLEAN WATER ACTION